IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LORELEI KNOWLES, )
)
                Plaintiff, )
)
          v. )
)
TRANS UNION LLC, )
)
                Defendant. )

Case No. 03 C 4952

Judge Mark Filip

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lorelei Knowles ("Plaintiff" or " Ms. Knowles"), brings this action against her former employer, Trans Union LLC ("Defendant" or "Trans Union"). Plaintiff, who is African-American, alleged that Trans Union violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by subjecting her to a race-based hostile work environment (Count I) and terminating her employment because of her race (Count II). The Court previously granted Defendant's motion for partial summary judgment with respect to Count I. (D.E. 37.) With respect to Count II, Plaintiff alleges that Defendant's decision to terminate her was an act of racial discrimination in violation of Title VII. (D.E. 10 ¶ II.12.) This case is before the Court on

Defendant's Motion for Summary Judgment on Count II. (D.E. 65.)[1] For the following reasons, Defendant's motion is granted.

I.    Relevant Facts

    A.    Lack of Compliance with Rule 56.1

The relevant facts are taken from the parties' filings under Local Rule 56.1 ("L.R. 56.1"). As is the practice in this district, the Court only considers those facts or additional facts that are presented in conformity with L.R. 56.1.

The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance" with L.R. 56.1. *See Bordelon v. Chicago Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *accord Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005). The Seventh Circuit and district courts have not been wedded to enforcement of the local rule as a matter of mere formalism. Rather, precedent acknowledges that it is a "reasonable judgment" that "consistent, 'bright-line' enforcement is essential"—not

---

[1]    In this case, Plaintiff was represented by Valda Staton and Paul Anthony Brady. (*See* D.E. 6; D.E. 23; and D.E. 26.) Ms. Staton has been designated as the lead attorney since she and Mr. Brady entered their appearances shortly after the case was filed in 2003. (D.E. 6.) In September 2005, Mr. Brady sought to withdraw (i) because he received "limited cooperation at best from both the plaintiff and her nonresident counsel for the past year" (In May of 2004, Ms. Staton relocated from Chicago to Washington, D.C. (D.E. 23)) and (ii) because of "medical reasons . . .[such that he] can no longer act as counsel." (D.E. 70.) Mr. Brady came to court and explained that he had suffered a stroke and had been directed by his doctors to cut back on his work commitments, such that he no longer could continue in the case. Under those circumstances, the Court allowed him to withdraw and to leave Ms. Staton as counsel for Plaintiff. (D.E. 73.) At that time, the Court *sua sponte* extended the deadline for Plaintiff to file responsive papers to the pending summary judgment motion, which deadline had already passed, and the Court gave Ms. Staton and Plaintiff 30 days to file a response to the motion. Ms. Knowles has chosen to file papers in opposition to Defendant's motion for summary judgment on Count II *pro se*. However, she continues to be represented by Valda Staton, as she has been since the Fall of 2003.

only in promoting compliance with the local rule, but also "to ensuring that [the] long-run aggregate benefits in efficiency" that L.R. 56.1 is intended to produce are realized for the system of justice in the Northern District of Illinois. *Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (collecting cases); *accord, e.g.*, *Midwest Imports v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995). In addition, the process established in L.R. 56.1 (and its predecessor, L.R. 12(M) and (N)), helps focus and narrow the factual disputes so the court is not attempting to guess at what fairly can be argued and inferred from an often massive factual record; that dynamic helps to ensure that the summary judgment process best promotes fair results for all.

Defendant filed a statement of facts pursuant to L.R. 56.1(a)(3) in conjunction with its motion. (D.E. 66.) Rather than, as the rule instructs, filing a response to Defendant's statement of facts (*see* L.R. 56.1(b)(3)(A)), and a separate statement of additional facts (*see* L.R. 56.1(b)(3)(B)), Ms. Knowles has included additional facts within her responses. (D.E. 76 ("Plaintiff's Response").) The Seventh Circuit has consistently affirmed that this practice is improper under the rule and statements contained in responses that go beyond what is necessary to justify a denial will not be considered. *See Cichon*, 401 F.3d at 809 (collecting cases); *Midwest Imports*, 71 F.3d at 1316-17. Thus, the Court disregards the additional statements of fact contained in the following paragraphs of Plaintiff's Response: ¶¶ 4, 8, 11, 14, 16, 18-21, 23-29, 31-33, 35-36, 39-49, 51, and 52-54, 59-67.

With respect to Plaintiff's denial of properly supported statements of fact, Plaintiff not only attempts to include additional facts, but also Plaintiff's responses to the following paragraphs of the Defendant's Rule 56.1 statement fail to provide any record support for their purported denials: ¶¶ 4, 8, 11, 14, 16, 18-19, 21, 23-29, 31-33, 35-40, 42-43, 45, 47-49, and 52-

3

67. (The denials provide no citations and there are no evidentiary materials attached to the unsworn Response.) The Court therefore deems admitted these paragraphs of Defendant's L.R. 56.1 statement. *Accord, e.g*, L.R. 56.1(a), (b)(3)(B); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission); *see also Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (court need not attempt to scour the record to create appropriate arguments for a litigant); *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

Plaintiff also has failed to respond to paragraphs 68 through 73 of Defendant's Rule 56.1 statement. These paragraphs are, therefore, deemed admitted. *See, e.g., Kozola*, 385 F.3d at 1108 ("'[A]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.'") (quoting Local Rule 56.1(b)(3)(B)).

Finally, Plaintiff claims to lack sufficient knowledge with respect to paragraphs 55-57 of Defendant's L.R. 56.1 statement to admit or contest them. Precedent teaches that responses such as "without knowledge or information sufficient to admit or deny" are unacceptable at the summary judgment stage. *See, e.g., Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 626 (7th Cir. 1998); *Williams v. Elvyea*, 163 F. Supp. 2d 992, 994 (N.D. Ill. 2001). A non-movant must establish a genuine issue of material fact to prevent summary judgment. A response that the non-movant does not have sufficient information cannot create a dispute, and thus the Court deems these statements of fact admitted. For this additional reason, paragraphs 55 through 57 are deemed admitted.

4

Plaintiff's failure to properly bring virtually any facts before the Court is sufficient on its own to grant Defendant's motion, as Plaintiff has failed to adduce any evidence to forestall summary judgment in response to Defendant's materials. *See Malec*, 191 F.R.D. at 584 ("[T]he penalty for failing to properly respond to a movant's 56.1(a) statement is usually summary judgment for the movant."). For the reasons explained below, however, even if one were to ignore Plaintiff's fatal procedural deficiencies, Defendant would still be entitled to summary judgment in any event for multiple, independent reasons.

B.    Facts

Defendant, Trans Union, is a global provider of business intelligence services, including credit reporting, primarily to consumer-oriented businesses and lending institutions. (D.E. 66 ¶ 10.) The company has over 3,600 employees and operates in all 50 states and more than 24 countries worldwide. (*Id.*) Trans Union maintains an Equal Employment Opportunity Policy ("EEO Policy") which provides, *inter alia*, that all employment decisions shall be made without regard to an employee's race, color, or other protected status. (*Id.* ¶ 11.) The EEO Policy is contained in the company's handbook, which is disseminated to all employees. (*Id.*) Additionally, it is the company's policy that all major employment decisions, including employment terminations, must be reviewed by its human resources department for compliance with the EEO Policy. (*Id.*)

1.    Employment with Trans Union

Trans Union hired Ms. Knowles on October 6, 1997 as a programmer analyst in its Enterprise Information Systems ("EIS") department, one of eight departments under its Information Systems and Services Division ("ISSD"). (*Id.* ¶¶ 12-13.) The ISSD was headed by

5

the company's Chief Information Officer ("CIO"), Len Lombardo. (*Id.*) From the time of Ms. Knowles's hiring until approximately mid-2000, she reported to Doug Sipes, a manager within the EIS department. (*Id.* ¶ 14.) Ms. Knowles's main duties and responsibilities during that time included writing computer programs and performing an overhaul of a particular computer program. (*Id.*)

Sipes prepared annual evaluations of Ms. Knowles's performance for the years 1997, 1998 and 1999, which were generally satisfactory. (*Id.* ¶¶ 15-18, 25.) In these evaluations, Sipes assigned Ms. Knowles overall "System to Evaluate Performance" ("STEP") scores–a tool used by the company to measure and compare employees' performance–of 235, 230, and 220, respectively. (*Id.* ¶¶ 15, 18, 25.) In the 1997 Evaluation, Sipes stated that one of Ms. Knowles's goals for the coming year was to learn new technologies such as the "Forte" programming language. (*Id.* ¶ 16.) Ms. Knowles received salary increases in 1997, 1998, and 1999. (*Id.* ¶¶ 15, 18, 25.)

In mid-2000, Trans Union reorganized the EIS department and reassigned Sipes to oversee the development of a new computer system called "Phoenix," which was being designed by Conquest, an outside consulting firm. (*Id.* ¶ 26.) Accordingly, Ms. Knowles began reporting to Ron Wegrzyn, but her duties and responsibilities remained the same. (*Id.*) Because both Phoenix and another major system supported by the EIS department are programmed in Forte, Wegrzyn and Tim Shanovich, the director of the EIS department, selected Ms. Knowles to be included in a group of six employees to participate in an extensive 16-week training course in Forte taught by programmers from Conquest. (*Id.* ¶¶ 27, 29.) In Wegrzyn's periodic review of Ms. Knowles's job performance, he emphasized that Ms. Knowles's completion of the Conquest

6

training was her "most critical" assignment for the remainder of the year because, in the future, Trans Union "would not be able to fund [an in-house] support staff as well as a team of outside consultants." (*Id.* ¶ 29.) In Ms. Knowles's 2000 annual performance evaluation, which Wegrzyn completed on February 6, 2001, he gave her a total STEP score of 221, which was slightly higher than the 220 points Sipes gave her for 1999. (*Id.* ¶ 34.)[2]

At the end of 2000 or beginning of 2001, Ms. Knowles requested and was granted a transfer back to Sipes's supervision. (*Id.* ¶ 36 and Ex. N ("Wegrzyn Aff.") ¶ 10.) As a result, Ms. Knowles became a member of the Phoenix team where it was expected that she utilize and expand the Forte skills covered in the Conquest training program she undertook in 2000. (*Id.* ¶ 36.) Jerry Koske, one of the Conquest consultants working on the development and installation of the Phoenix system, reported problems with Ms. Knowles's performance. (*Id.* ¶ 42.) Koske sent an e-mail outlining his concerns to his superior at Conquest, who, in turn, forwarded the e-mail to Sipes. (*Id.*) Koske reported that Ms. Knowles: had not become proficient enough with the Phoenix technologies to perform anything more than basic tasks; failed to properly communicate issues she was experiencing; required excessive supervision in order to perform many assigned tasks; and seemed to lack "any real understanding of what was going on in her pattern for writing and debugging the code." (*Id.*) Koske further reported that Ms. Knowles's weekly updates were "by far the poorest updates of all the developers." (*Id.*) Sipes discussed Koske's email with Ms. Knowles and, thereafter, monitored her performance on the Phoenix development team. (*Id.* ¶ 45.) After approximately two months of monitoring her performance,

---

2      In the 2000 Evaluation, Mr. Wegrzyn commented, *inter alia*, that Ms. Knowles should "ask for help sooner" when she is "stuck on an assignment due to not understanding the requirements or technical issues." (D.E. 66 ¶ 35.)

7

during which time her performance did not improve, Sipes decided that he could no longer assign further Forte tasks for the Phoenix development project to Ms. Knowles and removed her from the project. (*Id.*)[3]

Sipes left Trans Union in or about March 2002, and Ms. Knowles was again assigned to report to Wegrzyn. (*Id.* ¶ 49.) During the period she worked for Wegrzyn in 2002, her duties included support and modified duties for Phoenix where she did not have to use Forte. (*Id.*)

2. Internal Complaints

On or about September 12, 1999, Ms. Knowles sent Snipes an e-mail alleging for the first time that in May of that year, one of her co-workers, Beverly Gehrt ("Gehrt"), became upset with her for making a typographical error in a programming code and shoved her from the back. (*Id.* ¶ 22-23.) Ms. Knowles claimed that Gehrt was rude to her on September 10, 1999, and also "in the past." (*Id.* at 22).[4] Sipes spoke with Gehrt, and then told Ms. Knowles that he felt the situation was resolved. (*Id.* ¶ 24.) Although Ms. Knowles did not agree that the situation had been resolved, she admits that Gehrt never touched her again. (*Id.*)

---

[3]     On February 11, 2002, Sipes issued Ms. Knowles's performance evaluation for 2001. (D.E. 66 ¶ 48.) Sipes gave her an overall rating of "meets job requirements," noting that she "exceeds job requirements" with respect to her work on the Bank One system, and that her work on Forte in support of the Phoenix project "needs improvement." (*Id.*) Specifically, Sipes observed that, "She [Ms. Knowles] is struggling with her Forte on the Phoenix project as previously documented. Because of her inability to apply her Forte knowledge to the Phoenix project, I had to transfer her to other tasks for Phoenix." (*Id.*) Sipes also stated that "[Ms. Knowles] struggles with Forte assignments and this is hindering her progress in the EIS department." (*Id.*) Ms. Knowles received an overall rating of 2.11, which Trans Union equated with a STEP score of 211 under the previous format. (*Id.*)

[4]     Ms. Knowles did not contend in the September 12th email, or at any time thereafter, that the shoving incident was racially motivated. (D.E. 66 ¶ 23.)

8

In or about November of 2000, Ms. Knowles complained to Wegrzyn that Shanovich, the director of the EIS department, pushed her chair while she was sitting in it because he was angry with her for failing to promptly return his phone call. (*Id.* ¶¶ 30-31.) Ms. Knowles claimed the incident occurred in January of 2000. (*Id.*) Ms. Knowles also told Wegrzyn of her previous allegations against Gehrt. (*Id.*)[5] Wegrzyn immediately contacted Stacey Savo at the Human Resources department, who fully investigated Ms. Knowles's allegations and found no corroboration for the alleged incidents. Although the allegations were determined to be unfounded, shortly after Ms. Knowles lodged her complaint, she was reassigned from reporting to Gehrt to reporting to Sipes again. (*Id.* ¶ 32-33. ) Ms. Knowles was happy to be reassigned to Sipes. (*Id.*)

On July 19, 2002, during the second period when Ms. Knowles was supervised by Wegrzyn, she sent an e-mail to Len Lombardo, Trans Unions' CIO, complaining of unfair treatment. (*Id.* ¶ 50.) Specifically, Ms. Knowles claimed that Wegrzyn ignored and berated her and failed to create a development plan for her; that she had not been reimbursed for a programming class she had taken at DePaul University; that Wegrzyn gave work to a co-worker that Ms. Knowles felt should have been assigned to her; and that Wegrzyn did all of this in retaliation for her complaints directed at Shanovich and Gehrt, which she had made over a year earlier. (*Id.*) Upon receipt of the e-mail, Lombardo contacted the Human Resources department regarding Ms. Knowles's allegations; Ebony Only and Savo were assigned to investigate the

[5]     Although Ms. Knowles claims this incident occurred in January 2000, by her own recollection, she did not report this incident to anyone in management until it was announced in mid-November 2000 (approximately eleven months later) that the EIS department was going to be reorganized again and that Gehrt was going to be her team leader and that she still would report indirectly to Shanovich. (D.E. 66 ¶ 31.)

9

matter. (*Id.* ¶ 51.) After an extensive investigation, Only and Savo determined that Wegrzyn had not violated any of Trans Union's policies or treated Ms. Knowles inappropriately. (*Id.*)

3. Termination

In the wake of the September 11, 2001 attacks, Trans Union's Chief Executive Officer, Harry Gambill, asked all executives reporting to him to identify and implement cost-cutting measures wherever possible in their respective areas of responsibility. (*Id.* ¶ 55.) In mid-to-late August 2002, Lombardo instructed the eight senior directors who reported to him to review their respective operations to determine whether cost reductions could be achieved either through staff reductions or other measures. (*Id.* ¶ 56.) After meeting with Lombardo, Shanovich met individually with the two managers reporting to him—Wegrzyn (who managed the billing side of the EIS department) and Shawn McNamara (who managed the sales reporting and financial systems subgroup of the EIS department)—to review and identify areas within the department where cost-cutting measures could be taken without compromising service levels or the integrity of the systems being maintained. (*Id.* ¶ 57.) In performing the review, Shanovich, Wegrzyn and McNamara assessed the anticipated needs and workloads for the coming year for each of the sub-departments within the EIS department. (*Id.*) Based on this review, Shanovich and Wegrzyn determined that the Legacy/Batch Billing/Taxes subgroup was over-staffed by two positions and that one programmer analyst and one technical analyst position could be eliminated. (*Id.* ¶ 58.)

To determine which employees to retain, Shanovich and Wegrzyn evaluated the relative skills of the employees on the billing side of the EIS department and determined which employees had specific skills or responsibilities without which the department could not operate efficiently. (*Id.* ¶ 59.) Wegrzyn and Shanovich then performed comparisons of the remaining

10

employees to determine the best candidates for retention. (*Id.* ¶ 60.) Specifically, they analyzed the skills each of the employees possessed in relation to the ongoing needs of the department, the employees' past performance ratings included in their annual reviews, and, less importantly, the employees' tenure. (*Id.*) Based on the skill evaluation and the annual performance ratings, Wegrzyn and Shanovich decided to terminate Ms. Knowles, a programmer analyst, and Peter Giraldi, a technical analyst. (*Id.* ¶ 61.) With respect to Ms. Knowles, Wegrzyn and Shanovich agreed that she did not possess the appropriate skills in the systems and programming languages that were necessary for the operation of a much leaner EIS department. (*Id.* ¶ 62.)[6]

Ultimately, the decision as to which programmer analyst would be retained in the reduction-in-force was between Ms. Knowles and Ellen Parrish, the other programmer analyst in the Legacy/Batch Billing/Taxes subgroup of the EIS department. (*Id.* ¶ 63.) Because Parrish possessed a higher performance rating, was the person most familiar with the only functional batch-billing system Trans Union had at the time, was one of only two employees with experience in the Tax System, and possessed a deep knowledge of the business needs of the batch-billing system, she was recommended over Ms. Knowles for retention. (*Id.*) Ebony Only and Patricia Bradley of Human Resources analyzed the recommendation for compliance with Trans Union's EEO Policy. (*Id.* ¶ 64.) After Human Resources verified compliance, Shanovich presented the recommendation to Lombardo, who also approved of the termination. (*Id.*)

---

[6]     Specifically, despite extensive training, Ms. Knowles struggled with Forte and had been removed from the team of programmers who were developing Phoenix. (D.E. ¶ 62.) Her lack of Forte skills and practical experience with other programming languages also precluded her from performing many integral programming and support functions. (*Id.*) Wegrzyn and Shanovich assessed that most of Ms. Knowles's skills were based in skills that many others in the group also possessed, and which the EIS department was migrating away from. (*Id.*)

11

In addition to the proposed elimination of Ms. Knowles's and Giraldi's respective positions in the EIS department, the managers of the seven other ISSD departments recommended the elimination of twelve other employees, for a total of fourteen positions eliminated within ISSD. (*Id.* ¶ 65.) Of the fourteen selected employees, eleven were Caucasian and three were African-American. (*Id.*) Based on the managers' recommendations, Lombardo approved the job eliminations and coordinated the facilitation of those eliminations with Bradley from the Human Resources department to ensure that the job eliminations were handled properly and consistently, and to coordinate the ISSD job eliminations with eliminations that were taking place in other areas of the company. (*Id.*)

Ms. Knowles was informed of the elimination of her position in a letter from Wegrzyn, dated October 3, 2002, and in a face-to-face meeting with Wegrzyn and Bradley on the same date. (*Id.* ¶ 66 and Ex. BB.) The letter stated that the reduction in force, effective December 31, 2002, was based upon the completion of the Bank One and Phoenix development projects, the anticipated replacement of the batch-billing system, and the consolidation of certain subgroups in the EIS department. (*Id.*) The letter also stated that Ms. Knowles was eligible for rehire if an opportunity became available in the EIS department or anywhere else within Trans Union and was entitled to basic severance benefits, which included five weeks pay (one week for each of her years of service) and use of Trans Union's career counseling services, which included resume building, interviewing techniques, and internet job searches. (*Id.*) Finally, the letter explained that, by remaining on the payroll until December 31, 2002, Ms. Knowles was eligible for additional benefits including payment for the three weeks of vacation and retirement plan contributions she would have been eligible for in 2003. (*Id.*)

12

On October 31, 2002, Ms. Knowles sent an e-mail to Lombardo, in which she requested a meeting to discuss the elimination of her position and her belief that she had been unfairly chosen for termination. (*Id.* ¶ 68 and Ex. CC.) In the e-mail, Ms. Knowles stated that she believed she was terminated for lodging previous complaints against Gehrt, Shanovich, and Wegrzyn, but she did not mention that she believed she had been selected for termination based upon her race. (*Id.*) Lombardo and Bradley from Human Resources met with Ms. Knowles on November 8, 2002. (*Id.*) During this meeting, Lombardo and Bradley reiterated that the elimination of Ms. Knowles's position was a business decision based on the reduced needs of her department and the relative skills of the EIS department's employees. (*Id.*) Ms. Knowles did not mention at this meeting that she believed her race was a factor in the decision to terminate her employment. (*Id.*)

Ms. Knowles then requested a meeting with Trans Union's Chief Executive Officer, Harry Gambill, regarding her pending termination. (*Id.* ¶ 70.) Gambill granted Ms. Knowles's request for a meeting and he and Executive Vice President, Mary Krupka, met with her. (*Id.*) Gambill and Krupka confirmed the business reasons for her termination. (*Id.*)

II.     Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue

13

of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

III.    Discussion

Plaintiff has failed to provide any relevant law with which to address her various and diverse statements regarding her allegedly wrongful termination. Ms. Knowles does not explain the purported legal relevance under applicable precedent of her, with all respect, roaming allegations and arguments. While the Court is generally solicitous of *pro se* plaintiffs, Ms. Knowles is not a *pro se* plaintiff; she continues to be represented by counsel. In any event, at some point, the Court's solicitous treatment of any litigatant (*pro se* or otherwise) must be trumped by concerns for, *inter alia*, the need to maintain a neutral role as the adjudicator. "This court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel." *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) (internal quotation omitted); *accord, e.g., LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997) (collecting cases). Moreover, the Court "is not equipped to act as auxiliary lawyer for a party." *Tyler*, 70 F.3d at 466; *see also, e.g., United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). Rather than use its discretion to deem the entirety of Plaintiff's Title VII arguments waived as a matter of course—*see, e.g., LINC Fin. Corp.*, 129

14

F.3d at 921 (collecting cases)—however, the Court will consider Plaintiff's arguments to the extent that the Court is able to discern them.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). There are two ways that a plaintiff may establish a Title VII claim. First, she may offer direct evidence of discrimination, which is "evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotation omitted) (analysis of direct evidence of racial discrimination). Second, she may offer indirect evidence under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

A. Summary Judgment is Warranted Because Ms. Knowles Fails to Establish a *Prima Facie* Case.

1. Ms. Knowles Does Not Present Direct Proof that Trans Union Terminated Her Because of Her Race.

Ms. Knowles identifies no admission by Trans Union of the sort that precedent identifies as typically required to constitute "direct" evidence such that she could proceed under the direct method of proving his Title VII claims. *See, e.g., Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003) (noting that "[d]irect evidence usually requires an admission by the decision maker that his actions were based" on an illicit reason); *see also Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003) (discussing admissions,

15

convincing-mosaic analogy, and the direct method of proof); *Castleman v. ACME Boot Co.*, 959 F.2d 1417, 1422 (7th Cir. 1992) (teaching that direct evidence will "rarely" be found).

Plaintiff may also prevail under the direct method if she presents "a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Koszola*, 385 F.3d at 1109 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). "'That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action'" at issue. *Koszola*, 385 F.3d at 1109 (quoting *Rhodes*, 359 F.3d at 504).

Ms. Knowles claims, *inter alia*, that she was harassed and assaulted by Gehrt and Shanovich and Trans Union "did nothing to protect [her] against future acts of violence," that each year she "did more complicated work but received less points and less of a raise", that Trans Union provided a co-worker "with a mentor and no one to mentor" her, that Wegrzyn "berated [her] in front of her coworkers," that "Shanovich and Wegrzyn should not have been allowed to determine [her] employment . . .. [because] [t]hey were just retaliating,"[7] and she received less training that two co-workers (including Parrish). (D.E. 75 at 1-3.) As an initial matter, none of these claims are supported by competent evidence within the requisite framework set forth by the local rules. As a result, Ms. Knowles's argument fails on that basis alone.[8]

---

[7]     To the extent Plaintiff attempts to give life to a retaliation claim here, the Court respectfully disregards any such claim. Plaintiff may not amend the complaint through arguments in her brief in opposition to a motion for summary judgment. *See, e.g., Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). In any event, there is no evidence before the Court that Trans Union retaliated against Ms. Knowles for engaging in protected activity under Title VII.

[8]     Moreover, and, independently, a significant portion of Plaintiff's brief is dedicated to her unsupported allegations that she was subject to a hostile work environment (*i.e.*, attacked

16

In addition, even if the Court were to disregard this fundamental procedural defect—which it does not, *see, e.g., Koszola,* 385 F.3d at 1109 (collecting cases)—Ms. Knowles's attempt to offer direct evidence would nonetheless fail. She has not created a "convincing mosaic" that establishes a triable issue as to discriminatory intent for her termination. Rather, Plaintiff has, with all respect, simply written a stream-of-conscience-like account of why she was really qualified and others were not and why she should not have been fired from Trans Union. *Davis,* 368 F.3d at 782 (criticizing plaintiff as having "simply collected the sum total of all the unpleasant events in her work history . . ., dumped them in the legal mixing bowl of this lawsuit, set the Title VII blender to puree and poured the resulting blob on the court") (internal quotation and citation omitted). Although Ms. Knowles complains of several ways that she was supposedly mistreated, she does not explain how those acts translate into liability on the part of Trans Union. In particular, she failed to assert or offer anything to demonstrate that race was a factor with respect to the alleged mistreatment or her termination, or for that matter, that there is any connection between any of the alleged mistreatment and her termination.

Defendant set forth evidence of two arguably racist statements in its papers—notwithstanding that Plaintiff does not place meaningful emphasis on either in her papers. In the interests of thoroughness, the Court will review them. Defendant first relates that Ms. Knowles testified at her deposition that she was "pretty . . . sure" that a consultant once

by Shanovich and Gehrt). (D.E. 75 at 1-2.) She does not allege that this hostility was at all connected to or because of her race. But, even if she had so alleged, the Court already granted Defendant summary judgment on Plaintiff's hostile work environment claim (Count I) on the ground that the claim was beyond the scope of the Charge of Discrimination she filed with the Equal Employment Opportunity Commission. (*See* D.E. 37.)

17

stated "you can teach monkeys to do anything," when referring to the substandard work of employees of another consulting firm, many of whom were of Indian ethnicity. (*See* Knowles Dep. at 174; D.E. 66 ¶ 71; D.E. 76 ¶ 27; D.E. 65 at 9 n.5.) To the extent such a comment was a racist one (as opposed to simply a juvenile statement of an overly competitive consultant about the workers of a competitor), it does not show any animus or harassment of Ms. Knowles. The statement also is not alleged to have any connection with Defendant's decision to terminate Ms. Knowles or that the consultant had any input into that decision. (D.E. 66 ¶ 71.)

In addition, Defendant relates that Ms. Knowles testified that on one occasion, her co-worker, Ms. Gehrt called her "girl" and a male African-American employee "boy." (*See* Knowles Dep. at 266-67; D.E. 65 at 9 n.5.) It goes without saying that such statements, if made by Ms. Gehrt and if made as racist statements, are improper and wrong; however they do not create a triable case for the jury concerning Ms. Knowles's termination. It is undisputed that any statements of the co-worker, Gehrt, had no connection with Trans Union's decision to terminate Ms. Knowles. (D.E. 66 ¶ 71.) It is also undisputed that Ms. Gehrt had no input into the decision of who would be terminated. (*Id.*) Ms. Knowles has not even attempted to demonstrate any "causal nexus" between these isolated remarks and the company's decision to discharge her. *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563 (7th Cir. 1989), teaches that direct evidence of discriminatory intent "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Id.*, 876 F.2d at 569; *accord, e.g.*, *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876-77 (7th Cir. 2002) (collecting cases and teaching that alleged discriminatory or racist statements of non-decisionmakers do not show discrimination with respect to challenged employment action). Moreover, "to be probative of

18

discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision-making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996). Nothing in the record suggests that the comments were made near the time of Ms. Knowles's termination, or that Gehrt or the consultant, the persons who allegedly made the comments, had any input in the decision regarding Ms. Knowles's termination or the reduction in force. (*See* D.E. 66 ¶¶ 55-66.) As such, the alleged statements, which are assumed to have been made, do not create a triable issue for the jury under well settled law.

Finally, Plaintiff's bare, unsupported accusation that "[t]his is discrimination" (*see, e.g.*, D.E. 75 at 1), without more, cannot carry the day. *See, e.g., Koszola*, 385 F.3d at 1111 (collecting cases; internal quotes and citations omitted); *Krchnavy*, 294 F.3d at 877 (dismissing employment discrimination claim and stating that "[i]t is well settled that conclusory allegations without support in the record do not create a triable issue of fact") (internal quotation marks and citation omitted); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984-85 (7th Cir. 1999) (similar statement). In short, Ms. Knowles has failed to come forward with any circumstantial evidence to support an inference of discrimination under the direct method.

> 2. Ms. Knowles Also Fails to Establish A *Prima Facie* Case Under The Indirect Method.

In evaluating Ms. Knowles's alleged indirect evidence of race discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting analysis. *See, e.g., Michas v. Health Costs Control of Ill.*, 209 F.3d 687, 693 (7th Cir. 2000). The *McDonnell Douglas* method of proof entails three steps. A plaintiff must first establish a *prima facie* case of employment discrimination. *Id.* To establish a *prima facie* case, a plaintiff must demonstrate that (1) she is a

19

member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she was subject to an adverse employment action, and (4) she was treated less favorably than others not in the protected class who were similarly situated. *Id.* If the plaintiff establishes a *prima facie* case of discrimination in this manner, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *See, e.g., Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir. 1995). If that evidence is unrebutted by the plaintiff or if she fails to raise a triable issue as to whether the offered reasons are pretextual, the defendant is entitled to summary judgment. *See, e.g., Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir. 2002) ("[Pretext] means a dishonest explanation, a lie rather than an oddity or an error."); *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1145 (7th Cir. 1994) (pretext means "that a discriminatory reason more likely motivated [the defendant] or that the proffered explanation is unworthy of credence").

Trans Union argues that Ms. Knowles does not satisfy the fourth element of a *prima facie* case. (D.E. 65 at 11.) At the outset, the Court notes that the Seventh Circuit has adapted the fourth element in certain scenarios "to reflect the reality of the workplace." *Michas,* 209 F.3d at 693; *accord Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999). Trans Union relies on the fourth element analysis as adopted in *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002). Specifically, Trans Union cites *Krchnavy* for the proposition that, "in the context of a RIF [a reduction-in-force], where the plaintiff's duties will be absorbed by the remaining employees," the plaintiff must demonstrate that "her duties were absorbed by employees who were not members of the protected class." (D.E. 65 at 11 (citing *Krchnavy*, 294 F.3d at 875-76) (collecting cases).)

20

In the traditional RIF case, an employer permanently eliminates a position from the workplace. *See, e.g., Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). RIF cases are distinct from insubordination cases because in RIF cases, "an employer, in the course of restructuring the business, terminates several (or numerous) employees and does not *replace* them with new employees." *Miller*, 168 F.3d at 313 n.1 (collecting cases; emphasis in original). However, in a mini-RIF, employees remaining at the company absorb the duties of their former co-workers. *See, e.g., Krchnavy*, 294 F.3d at 876 (citing *Michas*, 209 F.3d at 693, and *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1331 (7th Cir. 1995). Ms. Knowles's termination was part of a restructuring to reduce overall costs at the company. (*See, e.g.,* D.E. 66 ¶ 55-66 and Ex. BB.) In other words, the record reflects that the termination was a part of a RIF. Less clear from the evidence adduced is whether her termination was part of a "mini-RIF" (*see, e.g., Krchnavy*, 294 F.3d at 876), that is, whether employees remaining at Trans Union absorbed Ms. Knowles's duties. Neither party offered evidence demonstrating that other employees absorbed Ms. Knowles's duties and responsibilities, but this easily could be inferred from the record. The Court need not decide this matter or speculate further about it, however, because Ms. Knowles fails to make a *prima facie* case under either the traditional RIF or the mini-RIF formulation.

In traditional RIF cases, courts in this circuit apply a "fungibility" analysis, in which a discharged plaintiff must show that she was treated less favorably than one or more similarly-situated or equally-qualified employees not in her protected class who were retained. *See, e.g., Miller*, 168 F.3d at 313. To do this, she must show "at a minimum that the [comparators] possessed analogous attributes, experience, education, and qualifications relevant to [her position]." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (collecting cases).

Ms. Knowles "need not show complete identity in comparing [herself] to the better treated employee[s], but [s]he must show substantial similarity." *Id.* (citation omitted). In addition, a plaintiff typically should provide evidence of a common supervisor or decisionmaker to show substantial similarity. *See, e.g., id.* at 617-18. Applying these standards, the Court finds that Ms. Knowles falls far short. Notwithstanding the fatal point that Ms. Knowles has not properly brought any evidence before the Court, Ms. Knowles has failed to identify other similarly situated comparators of other races who were treated differently, as she must. To the extent Ms. Knowles discusses Ellen Parrish, or other co-workers, Ms. Knowles fails to articulate, let alone show, substantial similarity between herself and these employees.

With respect to the Seventh Circuit's "mini-RIF fungibility" analysis, a plaintiff may satisfy the fourth prong with evidence that employees who were not members of the protected class absorbed her duties or "constructively replaced" the plaintiff following her termination. *See Bellaver*, 200 F.3d at 494-95. Specifically, Ms. Knowles must show that her duties, at the very least, were absorbed *mostly* by employees not in her protected class. *See, e.g., id.* at 495 (citing Seventh Circuit caselaw in which plaintiff showed that duties "were absorbed *mostly* by younger workers" in age discrimination mini-RIF case) (emphasis added); *Kazhinsky v. Meyer & Sons, Inc.*, No 02 C 7254, 2003 WL 22735867, at \*5 (N.D. Ill. Nov. 19, 2003) (Zagel, J.) (collecting cases and holding that, "[b]ecause half of the individuals who assumed [the plaintiff's] job duties were in the protected class, she cannot show that her duties were assumed solely or even primarily by employees outside the protected class"). Under this standard, Ms. Knowles does not make a *prima facie* case under the mini-RIF formulation, either. Ms. Knowles failed to set forth any evidence to support who actually absorbed her duties. To the contrary, Ms. Knowles stated

that she had no knowledge, notwithstanding the opportunity for discovery, regarding who absorbed her duties after her employment was terminated. (*See, e.g.*, D.E. 66 ¶ 72 and Knowles Dep. at 255.)

Plaintiff has failed to adduce sufficient evidence to satisfy the fourth element of the *McDonnell Douglas* test. This defect is enough in itself to defeat her *prima facie* case and warrant summary judgment on Count II. *See, e.g.*, *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 798 (7th Cir. 1995); *Villa v. City of Chicago*, 924 F.2d 629, 631 (7th Cir. 1991).

      B.    Summary Judgment Is Warranted For the Independent Reason That Ms. Knowles Has Failed to Create A Triable Issue Concerning Pretext.

Even if Ms. Knowles had made out a *prima facie* case (which she did not), summary judgment would be justified for the alternative and independent reason that she has shown no triable issue concerning whether Trans Union's articulated non-discriminatory reason for terminating her was actually a pretext for race discrimination. To show pretext in a RIF case, an employee "must establish that an improper motive '"tipped the balance'" in favor of discharge." *Krchnavy*, 294 F.3d at 876 (quoting *Testerman v. EDS Tech. Products Corp.*, 98 F.3d 297, 303-04 (7th Cir. 1996)) (in turn quoting *Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 213 (7th Cir. 1995)). It is insufficient "for the employee to show that the employer acted incorrectly or undesirably by firing him"; instead, "'the employee must show that the employer did not honestly believe in the reasons it gave for firing him.'" *Id.* (quoting *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)).

Trans Union has produced evidence of non-discriminatory reasons for terminating Ms. Knowles's employment, including company-wide efforts to reduce costs and the fact that the EIS

23

department could operate with two less employees due to the discontinuance of certain computer systems. (D.E. 63 ¶¶ 55-58.) The company selected many employees, including mostly those not in Ms. Knowles's protected class, for termination. (*Id.* ¶ 65.) Shanovich and Wegrzyn selected Ms. Knowles based on, *inter alia*, her lack of Forte programming skills, and her relatively limited overall skill set and low STEP scores. (*Id.* ¶¶ 59-64.) Their recommendation was reviewed and approved by representatives of Trans Union's Human Resources department. (*Id.* ¶ 64.) Trans Union also sets forth unrebutted evidence explaining why Ms. Knowles, rather than Ellen Parrish, was selected for termination, including that Parrish possessed higher performance ratings, and was one of only two employees with experience in the tax systems. (*Id.* ¶ 63.)

Ms. Knowles has failed to cast meaningful, if any, doubt on Trans Union's non-pretextual reason for its decision to terminate her employment, and she certainly has not shown a triable issue exists on this score. The Seventh Circuit has repeatedly instructed that a district court does "not sit as a superpersonnel department" that reexamines the propriety, correctness, or wisdom of any otherwise lawful personnel decision. *Davis*, 368 F.3d at 785 (citation omitted). Under Title VII, "the focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Id.* at 784 (internal quotation and citation omitted); *accord, e.g., id.* ("[A] pretext for discrimination . . . means something worse than a business error; pretext means deceit to cover one's tracks." (internal quotations and citations omitted)).

In the case *sub judice*, Ms. Knowles has failed to present any evidence from which a reasonable inference might be drawn that Trans Union was motivated by a desire to discriminate

24

against her due to her race, rather than due to the legitimate, proffered reasons with respect to her termination. At most, Ms. Knowles has stated her own feelings that she should have been retained and someone else terminated. *Accord, e.g., Ost v. West Suburban Travelers Limousine*, 88 F.3d 435, 441 (7th Cir. 1996) (holding that a "plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.") (collecting cases; internal citations omitted); *Gustovich v. AT & T Comm., Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (*per curiam*) ("An employee's self-serving statements about [her] ability . . . are insufficient to contradict an employer's negative assessment of that ability. Such statements may create a material dispute about the employee's ability but do nothing to create a dispute about the employer's honesty—do nothing, in other words, to establish that the proffered reason is a pretext for discrimination.") (citation omitted). Ms. Knowles admits that she was not aware of the criteria used by Trans Union to determine which employees would be eliminated in the reduction in force and she concedes that she was not aware of the entirety of Parrish's job functions and duties before or after the reduction in force, and specifically was not aware if Parrish was responsible for supporting and maintaining Trans Union's tax system. (D.E. 66 ¶ 73); *see also, e.g., Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180-81 (7th Cir. 2002) (in order for a plaintiff to show that the selection of another employee was pretextual, "'the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question'") (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 103 (2d Cir. 2001)) (further internal citations and quotation marks omitted); *see also id.* (teaching that "'differences

25

in qualifications between job candidates are generally not probative evidence of discrimination unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue'") (quoting *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 279 (5th Cir. 1999)). In fact, Ms. Knowles admits that she has no information or evidence that the underlying decision to effectuate a reduction in force was pretextual. (*See* D.E. 63 ¶¶ 55-57.) None of the evidence in the record suggests that the Defendant did not honestly believe the stated reasons supporting the decision to select Ms. Knowles for termination.

Finally, Ms. Knowles presents no evidence of discriminatory animus, nor any evidence that would tend to disprove that Trans Union was motivated by a desire to cut costs and unnecessary expenses. (*See, e.g.*, D.E. 66 ¶¶ 55-56.) Reducing costs is obviously a legitimate goal for a business—*see, e.g.*, *Michas*, 209 F.3d at 695—including for a business that operates in a competitive marketplace like Trans Union. The fact that the overwhelming majority of terminated employees were white—eleven of fourteen—also cuts against a finding of pretext. (*See id.* ¶ 65.)

The Court thus finds that Ms. Knowles has failed to present evidence sufficient to create a genuine question of material fact as to whether Trans Union's facially legitimate reasons for discharging her were pretextual. Summary judgment is independently warranted on such basis, even assuming a *prima facie* case had been shown.

IV.    Conclusion

Ms. Knowles has not pointed to any facts raising a genuine material issue that would defeat Trans Union's motion for summary judgment. For the reasons set forth above, Trans Unions's motion for summary judgment as to Count II is granted.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: November 21, 2005

27